366 P.2d 594

Argel E. JEWELL, Jessie M. Jewell and Clarence C. Jewell, Jr., Plaintiffs and Respondents,

v.

Ethel Lee HORNER, formerly Ethel Lee Jewell, and William Powell and Irene Powell, his wife, Defendants and Appellants.

No. 9431.

Supreme Court of Utah.

Dec. 4, 1961.

Romney, Boyer & Ronnow, Salt Lake City, Jack B. Horner, Ames, Iowa, for appellants.

C. M. Gilmour, J. W. Boone, Salt Lake City, for respondents.

CALLISTER, Justice:

Defendants appeal from a judgment impressing a trust upon certain real property and assessing money damages. Plaintiffs cross appeal from that portion of the judgment allowing the defendant, Ethel Lee Horner, certain offsets and also cross appeal from an order of the lower court vacating a default judgment which had been entered against the defendants William and Irene Powell.

Plaintiffs are the brothers of Ethel and the Powells are the purchasers, under a real estate contract, from Ethel of the property involved.

The property involved is the Jewell family home located in Murray, Utah. The mother of Ethel and the plaintiffs died in December, 1940. At that time, the two eldest sons, Argel and Jesse, were married and living away from the home. The youngest son, Clarence Jr., married and moved from the home in June, 1941. Ethel, then unmarried, continued to live in the home with her father, Clarence Sr., until September, 1946 when she accepted a school teaching assignment in Payson, Utah. However, she would return or weekends and look after the needs of her father and clean the house.

Early in 1947 the father contemplated remarriage with a lady by the name of Eva. At this time the home did not have an inside bathroom or hot water. These improvements were made during the summer of 1947 with the proceeds of a loan to Ethel in the amount of $1,200. Ethel was

the sole obligor on the note evidencing the loan, and she repaid the same. After the improvements were completed the father married Eva, but the marriage was terminated by a divorce in 1948. Subsequently, the father married again, this time to a lady referred to as Lou. In December 1955, the father died and Lou continued to reside in the home until her death in August 1959. In November 1959, Ethel executed a real estate contract with the Powells wherein she agreed to sell the home, upon terms, for $8,500.

Ethel claims title to the property by virtue of a deed from her father dated April 4, 1947 and recorded on September 17, 1947. This deed purports to convey the property to Ethel "for Ten Dollars ($10.00) and other good and valuable consideration." However, the conveyance was made "subject, however to a life estate therein expressly reserved to the grantor herein, and, in the event the grantor should remarry, subject also to a life estate expressly reserved therein to his wife, and to the survivor of either of them, so long as either may live." Affixed to the deed, at the time of recordation, were federal revenue stamps in the amount of $2.20.

The plaintiffs claim, and the trial judge so found, that the father had conveyed the property, subject to the life estates, to Ethel in safekeeping and trust for the benefit of herself and the plaintiffs. This was denied by Ethel.

The principal witness relied upon by the plaintiffs, Mr. Fred Jensen, testified at the trial: That he was engaged in the real estate business in Murray, Utah, from 1927 to 1955 and had been a friend and neighbor of the Jewell family. That the father, Clarence C. Jewell, had executed the deed to the home in his office and in his presence. That the father had visited his office on two prior occasions and discussed the matter.

Mr. Jensen testified that Mr. Jewell had stated that he wanted to put the property in a shape where his proposed second wife (Eva) would not come into the picture "because he wanted the property, in case anything happened to him, to go to his children." Mr. Jewell further stated "that it was understood between he and the boys that (sic) Ethel the property should be kept intact away from his second wife so that he could keep that as a home for Ethel as long as she needed it." Mr. Jensen was sure that Mr. Jewell had used the word "safekeeping" in discussing the transaction.

Mr. Jensen had a young attorney in his office who "made the deed out the way Mr. Jewell wanted it, and then I notarized it."

On cross-examination Mr. Jensen was asked if, during a conversation with Ethel and her attorney prior to the trial, he had told them that Mr. Jewell had talked to him about doing anything for his sons. Mr.

Jensen replied: "No, I don't think he told me anything about that."

Clarence Jewell, Jr., testified to three conversations. The first one was in 1941 between himself, the father, and Ethel. At this time the father suggested that Clarence build a home on the property, that "it will belong to you boys anyway eventually." The second conversation was in 1946, after Ethel had moved from the home to teach at Payson. This conversation was between Clarence and his father and the latter stated that because he was all alone now he was "going to divide up this property among you" and "take rent from the home and move to the Iris Apartments". Clarence, however, suggested that his father "keep the place in one piece." The third conversation was between Clarence and his father sometime in 1947. On this occasion the father stated that "he was going to put the deed in Ethel's name for safekeeping for her and the boys so that Eva wouldn't be able to touch it." He further stated that "Ethel undoubtedly wouldn't be getting married and from all reports raising a family, and she would have a home to live in as long as she so wished it as a home."

Clarence further testified that in 1954 or 1955, after the building of a carport, the father was agreeable to Clarence taking part of the property for pasture and a barn, so he and Ethel visited an attorney who advised them that they would "have to get the deed out and change it over." Ethel did not object to executing a deed, but nothing was done because Ethel said, "Lou [the father's third wife] would not go along with it."

Clarence also testified that the family property was discussed prior to the father's death, within the family "innumerable times" and that it was the general understanding that the deed was given to Ethel "to insure that the property would remain in the family, equally shared by all, and that so long as Ethel was an old maid and resided there it was to remain intact."

Plaintiff Jesse M. Jewell testified to two specific conversations with his father. The first was in 1947, a few weeks before the father's marriage to Eva. On this occasion the father told Jesse "That he was planning on getting married again, and he was going to put this—to make out a deed to this property in Ethel's name more or less in safekeeping or to be held so that Eva wouldn't have a chance to get in on it being the second wife, and to keep that property for the family, for Ethel and the boys." The second conversation took place later in 1947 while the father and Eva were in the process of being divorced. According to Jesse, the father told him "that he was certainly happy that he had taken care of this deed and to keep this property for the family so that her children could not come in."

Plaintiff Argel Jewell testified to three conversations regarding the family home. The first was with his father in 1946, when his father indicated that he would "split the ground up between all of you boys and I will give Ethel the portion with the home on it." Argel advised his father against splitting the property. The second conversation occurred in the late summer of 1947. The father told Argel that he and Eva were having trouble and that Eva wanted him to move to her property and let her children live in his house. Argel stated "it seems like she wants the home for her children." The father replied that "it won't do her any good to feel that way about it. I have already placed the deed in Ethel's name. * * * I knew how you boys felt about it. You want Ethel to have a home as long as she liked, and you boys wanted ground to have a community garden. * * * I fixed it so it would be fixed for the family exactly as you wanted it, and you boys wanted it to protect Ethel and all of you." The father also stated that he had put the property "in Ethel's name in trust for all of you children." The third conversation took place at Argel's home shortly before the father married Lou. Members of the family, including Ethel, were present. Argel testified: " * * * and he went ahead and enumerated then that he had put the deed in trust in Ethel's name, in trust for her to have, and the boys, for to have a home to live in as long as she wanted, but he had kept a dower in it for himself and his widow, should he have one, and in that way he had provided for all the family, everyone, meeting their wishes. He would have a home, his widow would have a home, and Ethel would have a home, and from that point on it was, so to speak, community property, I suppose."

Argel also stated that over the years there had been many conversations in substance that "the house was left in Ethel's name in trust for the whole family, with her having a home to live in as long as she wishes."

Mr. Vaughn Soffe, a witness for the plaintiffs, testified that he was a funeral director and had handled the father's funeral. He stated that he had a conversation with the father sometime in 1955 at which time the father had told him to look to Ethel for payment of the funeral. When asked what Mr. Jewell said about the home, Mr. Soffe testified that, "He led me to believe that Ethel was to have the home."

The defendant, Ethel Lee Horner, denied that her father ever stated that she was to hold the property in safekeeping or trust for herself and her brothers. According to Ethel, her father, in the early part of 1947, advised her that he was contemplating matrimony and that he was embarrassed because the home did not have hot water or inside plumbing. He was unable financially to rectify this situation and asked Ethel if she would undertake the improvements.

He told her that if she would do so, he would give her a deed to the home, subject to a "lifetime lease" for himself and his intended wife.

It is undisputed that the cost of these improvements were paid by Ethel. In addition, it is also undisputed that Ethel paid the taxes and fire insurance premiums upon the home and also paid for a carport which was constructed in 1955.

Rosco King, an uncle of Ethel and the plaintiffs, testified on behalf of the defendants that he affixed the revenue stamps to the deed and caused the same to be recorded at the request of Mr. Jewell. He stated that Mr. Jewell told him that the reason for making the deed was that he "wanted Ethel to have a home."

Various other witnesses appeared for the defendants and testified to conversations with the father to the effect that Ethel was to have the home after he and his wife were dead.

■ This case is one in equity. The dominant question here is whether the plaintiffs, by clear convincing and satisfactory proof,[1] established the alleged parol trust with respect to the real property. The trial court so found, and this court, upon review, should not set aside the finding of

the lower court unless it manifestly appears that the lower court has misapplied proven facts or that the finding is clearly against the weight of the evidence.[2] For the reasons to be stated, we are of the opinion that the trial court's finding of a parol trust is clearly against the weight of the evidence and must be set aside.

■ The transfer of his home by the father to Ethel was made by a deed absolute, subject only to the life estates, and the authorities are practically uniform to the point that to justify a court in determining from oral estimony that a deed which purports to convey land absolutely in fee simple was intended to be something different, such as a trust, such testimony must be clear and convincing.[3] The proof must be something more than that modicum of evidence which this court sometimes holds to be sufficient to warrant a finding where the matter is not so serious as the overthrow of a clearly-expressed deed, solemnly executed and delivered.

■ With respect to the standard and quality of evidence required to establish an oral trust, this court in the case of Chambers v. Emery [4] stated:

"In such event the proof must be strong, clear, and convincing, such as

1. Jensen v. Howell, 75 Utah 64, 282 P. 1034; Capps v. Capps, 110 Utah 468, 175 P.2d 470.

2. Stanley v. Stanley, 97 Utah 520, 94 P. 2d 465; Haws v. Jensen, 116 Utah 212, 209 P.2d 229.

3. 23 A.L.R. 1500.

4. 13 Utah 374, 45 P. 192, 195.

to leave no doubt of the existence of the trust. Such a case is similar to one where it is attempted to convert a deed absolute into a mortgage, or where the reformation of a written instrument is sought on the ground of accident, mistake, or fraud. In all such cases the court will scrutinize parol evidence with great caution, and the plaintiff must fail unless it is clear, definite, unequivocal, and conclusive. Public policy, and the safety and security of titles to real estate, demand this rule, because such evidence is offered to overcome the strong presumption, arising from the terms and conditions of an instrument in writing, which is always the best evidence of title. If it were once established that the effect of the terms of a written instrument could be avoided by a bare preponderance of parol evidence, the gates to perjury would soon be wide open, and no person could longer rest in the security of his title to property, however solemn might be the instrument on which it was founded."

In the instant case the plaintiffs' evidence consists of the testimony of the three plaintiff brothers, Mr. Jensen, and Mr. Soffe. The testimony of Mr. Soffe did not aid plaintiffs' cause, in fact it has the opposite effect. The testimony of Mr. Jensen is, at best, vague and equivocal. The testimony of the brothers, while not so vague, is self-serving. All of the testimony is subject to the infirmities enumerated in Chambers v. Emery, supra, wherein the court described it as "unsatisfactory and dangerous" and to "depend wholly upon the uncertain recollection of witnesses, who, through lapse of time, or mistake, or imperfect understanding, or improper or corrupt motives, may represent the deceased as having expressed an idea precisely the reverse of what was intended by him" and "so capable of inaccuracy, so susceptible of fabrication, so impossible of contradiction, where the person alleged to have made the admissions is dead * * *."

Plaintiffs cite and rely upon Haws v. Jensen [5] wherein this court, upon a somewhat similar fact situation, upheld a trial court's finding of an oral trust. However, the evidence adduced in that case was of a much more satisfactory nature. Furthermore, in the Haws case there was no consideration for the deed from the mother to the daughter. In the instant case the deed is supported by a consideration as evidenced by the revenue stamps. Ethel paid for the needed improvements which cost approximately $1,200. The father, at the time of the improvements, caused the deed to be drawn by an attorney. At the father's request, the attorney provided for the reservation of a life estate. Had the father intended his sons to have an interest in the

5.   116 Utah 212, 209 P.2d 229.

property, it would have been a simple matter for the attorney to have so provided in the deed.

Finally, we find no merit in plaintiffs' cross appeal from the order of the lower court vacating the default judgment against the Powells. The lower court acted within its sound discretion.[6]

The judgment of the lower court against the defendants and in favor of the plaintiffs is reversed. The order of the lower court vacating the default judgment against the defendants Powell is affirmed. Costs to defendants.

WADE, C. J., and McDONOUGH, HENRIOD, and CROCKETT, JJ., concur.

---

6. Ney v. Harrison, 5 Utah 2d 217, 299 P.2d 1114.