2010 UT 52

**Donald RAWLINGS and Jeanette Rawlings, Plaintiffs and Respondents,**

v.

**Arnold Dwayne RAWLINGS and Paulette Rawlings, Defendants and Petitioners.**

Arnold Dwayne Rawlings and Paulette Rawlings, as Trustees of the Arnold Dwayne Rawlings Family Trust; Theron LaRell Rawlings; Bryce C. Rawlings; and Carol Lynn R. Masterson, Third-party Plaintiffs and Petitioners,

v.

Donald Rawlings and Jeanette Rawlings; and Donald Rawlings and Jeanette Rawlings as Trustees of a Trust whose name is unknown, Third-party Defendants and Respondents.

No. 20090059.

Supreme Court of Utah.

Sept. 3, 2010.

Rehearing Denied Sept. 12, 2010.

M. David Eckersley, Salt Lake City, for plaintiffs and third-party defendants.

Thomas W. Seiler, Provo, for defendants.

M. Dayle Jeffs, Provo, for third-party plaintiffs.

## AMENDED OPINION*

On Certiorari to the Utah Court of Appeals

DURRANT, Associate Chief Justice:

### INTRODUCTION

¶ 1 We granted certiorari in this case to determine whether the court of appeals erred in reversing the district court's imposition of a constructive trust. The parties in this case are siblings who dispute the ownership of farm land transferred by their father. The oldest sibling, Donald, received the land as the grantee under a warranty deed. He contends that his father transferred the land to him in exchange for payments he made on some of his father's debts. The family's four other siblings and their spouses (collectively, the "siblings") contend that their father deeded the land to Donald in an attempt to create a family trust. During the time period surrounding this transfer, their father had been diagnosed with cancer and owning the land made him ineligible for welfare assistance. The siblings contend that their father placed the property in their older brother's name so that he could act as trustee over the land and hold it for the benefit of the family. The siblings also contend that, in the decades since the transfer, the land was treated as a family farm and that they have contributed to its care, maintenance, and profitability.

¶ 2 The district court credited the testimony of the siblings and found that the oldest brother had been unjustly enriched by accepting the siblings' years of contributions to the success of the farm. Accordingly, the court exercised its equitable power to award a constructive trust in favor of the siblings. The court of appeals reversed. Concluding that certain of the district court's findings of fact were inconsistent with its award of a constructive trust, the court of appeals held as a matter of law that the siblings could not prevail on any theory of constructive trust. We exercised our jurisdiction pursuant to Utah Code section 78A–3–102(3)(a) (2008) and granted the siblings' petition for certiorari. We reverse the judgment of the court of appeals.

### BACKGROUND

¶ 3 Because the parties do not dispute any of the trial court's findings of fact, we recite the facts in accordance with those findings.[1]

¶ 4 The parties in this case are siblings whose father, Arnold Rawlings, owned twenty-two acres of land near Orem, Utah. In 1957, a few years before the events giving rise to this case occurred, Arnold transferred approximately twelve acres to a third party while retaining approximately ten acres that he operated as a family farm. Between 1960 and 1967, Arnold transferred portions of this farm land to his two oldest sons, Donald and Dwayne Rawlings.[2] The end result of these transfers was that both Donald and Dwayne received parcels approximately one acre in size on which to build their homes.[3] Arnold retained half an acre in the northeast corner of the property where his house was located. Except for these assorted parcels of land, the remainder of Arnold's property remained undivided until March 24, 1967. On that day, he transferred to Dwayne a small parcel—

---

* The court has rewritten footnote 5.

1. *See Due South, Inc. v. Dep't of Alcoholic Bev. Control,* 2008 UT 71, ¶ 2, 197 P.3d 82.

2. Dwayne's given name is "Arnold Dwayne Rawlings," but to distinguish him from his father, we follow the parties' lead in referring to him as "Dwayne."

3. The parcels were actually transferred to the sons and their spouses. Because the fact of co-ownership does not alter our analysis, and because we need to refer to the actions of the brothers more often than we need to refer to the actions of their spouses, we will generally omit mention of the spouses unless their actions have independent relevance.

approximately half an acre immediately south of Donald's land—which Dwayne has held in trust for the other members of the family. On the same day, Arnold transferred the remaining farm property to Donald, in one undivided parcel, via a general warranty deed. In contrast to the siblings' claims that Donald took the land as a trustee, Donald contends that this transfer was compensation for his having paid certain debts on his father's behalf.

¶ 5 The March 24 land transfers happened at a time when Arnold's health had substantially deteriorated. In October of the year before, he was diagnosed with cancer. Later that year he underwent surgery to remove a large tumor. Although he labored to recover from this surgery, Arnold began radiation treatments in January of 1967. He was hospitalized twice in the coming months, and by March 24, his health was very poor.

¶ 6 The siblings contend that the purpose of transferring the farm property to Donald was to facilitate his eligibility for welfare assistance. Sometime prior to December 16, 1966, Donald had contacted the State Welfare Department to discuss Arnold's eligibility, and it became apparent that Arnold would receive assistance only if the farm property was not held in his name.[4] Thus, shortly before the March 24 transfers, Arnold discussed with LaRell, his third oldest son, the need to take the property out of Arnold's name. They discussed the best means to effect this, and LaRell suggested that the property be transferred to Dwayne because LaRell believed Dwayne would be fair in his dealings with the family. Ultimately, Arnold decided to transfer the land to Donald instead. Arnold met once with LaRell and Donald, and later with Dwayne and Donald, to discuss these plans. The trial court credited this testimony and found that Donald offered no evidence to rebut it.

¶ 7 Around the time of the transfer, Donald and the siblings also conducted other business relevant to the farm property. First, in January of that year, Donald began telling Dwayne that Arnold needed approximately $1,000 to pay off the taxes on the farm. Dwayne borrowed the funds to pay these taxes on his father's behalf and gave the money to Donald. But it was not until the March 24 transfer was complete that Donald used this money to pay off the back taxes. Second, on the same day that Arnold transferred the farm property to Donald, the siblings and their spouses relinquished their interests in the farm property to Donald via a quitclaim deed. Over time, the siblings also transferred neighboring parcels of land to Donald to add to the trust property.

¶ 8 In the years after the transfer, Arnold continued to struggle with his health, but also continued to manage and collect the profits from the farm property until his death in 1971. Indeed, in the fall of 1969, Arnold struggled to complete the harvest on his own. So, the next spring, Arnold began corresponding with LaRell's commanding officers in the military in the hopes of having LaRell temporarily released from his duties so he could return and help with the maintenance of the farm. Arnold submitted notarized affidavits to this effect, and had a number of people write letters in support of this effort. These documents uniformly refer to the property as Arnold's Farm and refer to Arnold's efforts to harvest crops and maintain the farm, and given his health, the difficulty he faced doing it alone.

¶ 9 In addition to managing the property as a farm, Arnold also managed family affairs on the farm: when Arnold's youngest son, Bryce, sought to locate a mobile home on farm property, it was Arnold's permission he sought, and it was Arnold who decided the best location for the trailer. And less than a month after Arnold's death in 1971, Arnold's widow, Cleo—not Donald—paid the property taxes on all of the farm property.

¶ 10 For years after Arnold's death, the farm property was managed in a manner

4. The testimony of the siblings was not consistent with regard to Arnold's eligibility for welfare. Some of the siblings indicated that Arnold was afraid that he would have to pay back the value of any welfare assistance he received, and that this would leave the farm property vulnerable to claims by the Welfare Department. Because the parties do not dispute the trial court's finding that the transfer was necessary for Arnold to be eligible for welfare, we recite the facts as found by the district court.

consistent with it being held in trust for the family. Bryce continued to live on the land for four or five years after Arnold's death. Donald consistently represented to his siblings that income from the farm property was being used to support their mother. Because of these representations, all of the siblings, except Donald, worked in the orchard and helped to maintain the farm property. When Donald was asked during his deposition which of the siblings contributed to the operation of the farm property, Donald answered, "All I know is that I didn't."

¶ 11 Arnold's 1957 transfer of twelve acres south of the farm property led to a boundary dispute regarding the southern border of the farm property. During this dispute, Donald's representations to the family reinforced the idea that this land was being managed for the benefit of the family. Specifically, by 1974 a dispute had arisen over the location of the border between the farm property and the land that Arnold had transferred in 1957. Donald enlisted Dwayne to help erect a fence at the boundary line in the hopes of settling this dispute and protecting what Donald referred to as "Mother's farm." Donald also induced his siblings to sign a quitclaim deed for the farm property. He told them that the quitclaim deed encompassed only the land being disputed, but it actually described the entire farm property. The trial court found that this quitclaim deed would have been unnecessary if Donald had owned the property by virtue of the 1967 conveyance. Thus, it rejected Donald's contention that the purpose of the quitclaim deed was to clear up the title problems on the southern boundary. When Donald settled the boundary dispute for $52,000, he paid $500 each to Bryce and Carol Lynn (Arnold's only daughter), and $600 to Dwayne. He offered $500 to LaRell, but LaRell refused to accept the money. Donald also spent $5,000 to prepay burial funds for Cleo and to buy her a car.

¶ 12 Not until after 1993 were the siblings made aware that Donald considered the land to be his own property. A dispute arose regarding a piece of the farm property that formed part of the basis for a land exchange that Donald and Dwayne had undertaken in 1978. In exchange for a piece of industrial property valued at approximately $45,000, the two brothers each contributed $15,000. A small piece of the farm property, valued at approximately $15,000, constituted the remainder of their contribution. The industrial property they received was eventually divided into northern and southern halves, with each brother responsible for one of the halves. In 1993, Donald brought suit to establish himself as the owner of two-thirds of this property. He alleged that he alone held title to the farm property that formed part of the basis of the exchange. Alleging that Dwayne had no interest in the farm property, Donald contended that his share of the industrial property should reflect the fact that he contributed $15,000 worth of land and $15,000 in cash, whereas Dwayne only contributed $15,000 in cash. The district court found that this suit, filed in 1997, was the first repudiation by Donald of his trust responsibilities.[5] In response to Donald's suit to quiet title, Dwayne and the siblings filed counterclaims seeking imposition of a constructive trust.

¶ 13 Donald's version of events surrounding the 1967 transfer of farm property differs from that of the siblings. He contends that Arnold had mortgaged the farm property prior to being diagnosed with cancer and that Donald rescued the land from foreclosure by paying off his father's indebtedness. Thus, he contends that the deed transferring the land is exactly what it purports to be on its face: a general warranty deed transferring fee simple ownership. He contends that Arnold, prompted by Donald's payments of this indebtedness, intended to give him the farm property free of any implicit trust obligation.

¶ 14 The trial court explicitly discredited this testimony for a number of reasons. First, Donald had his own indebtedness with

5. Donald also challenges the district court's determination that the statute of limitations was tolled until Donald first made his siblings aware that he was treating the property as if he were the sole owner. We have reviewed the arguments made by both parties and the authorities cited in support of those arguments, and find no error in the trial court's resolution of this issue. Accordingly, the statute of limitations does not form an alternate basis for affirming the judgment of the court of appeals.

the same bank, and during the time when he would have been paying off his father's debts, his payments to the bank did not increase in a manner consistent with making additional payments. Second, after this litigation began, Donald's wife, Jeanette, altered the cancelled checks to the bank by inserting notes on the memo line to make it appear as though the checks were written to pay Arnold's mortgage. Third, the evidence was not consistent with the possibility of imminent foreclosure, because the bank had neither sent any notices of default (as it would have been required to do) nor attempted to foreclose on two vehicles that were also part of the security for the loan.

¶ 15 Ultimately, the district court found the testimony of the siblings persuasive and rejected Donald's version of events. It concluded that the purpose of the transfer was to accommodate Arnold's attempts at becoming eligible for welfare, not in exchange for payment of Arnold's debt and not to transfer ownership. It concluded the siblings had presented clear and convincing evidence to support an "equitable need to impose a constructive trust on the property." It also concluded that Donald and Jeanette had been unjustly enriched by keeping the $1,000 that Dwayne paid toward the property taxes, by keeping the bulk of the $52,000 received from the settlement of the boundary dispute, and by keeping "other benefits from the use and negotiations relative to the trust proper-

ty." Thus, the trial court entered judgment in favor of the siblings, concluding that the March 24 conveyance to Donald, along with the relevant quitclaim deeds, created a constructive trust on the property described therein.

¶ 16 The court of appeals reversed this judgment.[6] It began by comparing the two different theories under which a constructive trust may be imposed. One theory, which it called a "legal constructive trust,"[7] requires no showing of unjust enrichment. Instead, it concluded that in some cases a constructive trust is imposed to give effect to a grantor's attempt to create an oral express trust.[8] The court of appeals contrasted this sort of constructive trust with "equitable constructive trusts," which are imposed to remedy unjust enrichment.[9] It then determined that the trial court had failed to properly distinguish the two and had essentially used unjust enrichment as a substitute for proof of an oral express trust.[10] It concluded that the siblings' case must succeed or fail based on whether they had proven Arnold's intent to orally impose trust obligations.[11] According to the court of appeals, either Donald had violated Arnold's express wishes—which would make a legal constructive trust the only appropriate remedy—or the farm property belonged to Donald, in which case he had not been unjustly enriched by his years

6. *Rawlings v. Rawlings,* 2008 UT App 478, ¶ 13, 200 P.3d 662.

7. For purposes of this opinion, we decline to rely on the court of appeals' nomenclature. Specifically, it is unclear whether it is consistent with our case law to distinguish between "legal" constructive trusts and "equitable" constructive trusts. In the past, we have referred to constructive trusts as "equitable" remedies, even when they are based on oral express trusts. *See Haws v. Jensen,* 116 Utah 212, 209 P.2d 229, 231–32 (1949). We have also said that these remedies arise "by operation of law," insofar as they represent an exception to the statute of frauds. *See id.*

The labels used by the court of appeals are a convenient way of summarizing the distinctions that are relevant in this case. But, as we have said, " 'the forms and varieties of [constructive trusts] are practically without limit.' " *Parks v. Zions First Nat'l Bank,* 673 P.2d 590, 597 (Utah 1983) (quoting *Fitz–Gerald v. Hull,* 150 Tex. 39,

237 S.W.2d 256, 263 (1951)). We are apprehensive about adopting a categorization that may lead to confusion outside the confines of this case.

Although the phrasing is less convenient, we refer to the remedies in this case as either a constructive trust to give effect to an oral express trust or as a constructive trust to remedy unjust enrichment. Whether our holdings in this case will apply to other forms of constructive trusts will depend on the extent to which those other forms share characteristics with the constructive trusts at issue in this case.

8. *Rawlings,* 2008 UT App 478, ¶¶ 13–15, 200 P.3d 662.

9. *Id.* ¶ 16.

10. *Id.* ¶ 18.

11. *Id.* ¶ 17.

of ownership.[12]

¶ 17 Having come to this conclusion, the court of appeals acknowledged that it would normally be required to remand the case for factual findings regarding the elements of a legal constructive trust.[13] It did not do so, however, because such a claim requires the party challenging a warranty deed to prove the intent to create a trust.[14] But here, one of the trial court's findings stated that "Arnold did not consider the conveyance to be a transfer of his ownership rights in the property." Relying on this finding of fact, the court of appeals concluded that the siblings' claim must fail as a matter of law.[15] It reasoned that if Arnold did not intend to transfer ownership at all, then he could not have intended to create a trust because creation of a trust requires that title to the property be transferred to a trustee.[16] Thus, it dismissed the siblings' claims as a matter of law and instructed the trial court to enter judgment quieting title to the property in favor of Donald.[17]

¶ 18 We granted certiorari to determine whether the court of appeals correctly applied Utah's law of constructive trusts. Before us, the siblings argue that the court of appeals erred in two ways. First, they argue that the court of appeals erred by interpreting the trial court's finding of fact in isolation and in a manner inconsistent with its judgment. They contend that the finding of fact regarding Arnold's intent to transfer ownership can, and should, be interpreted to mean that Arnold intended to transfer bare legal title while maintaining the beneficial interest in the land. They argue that such an interpretation would support a constructive trust and that the court of appeals erred when it held that they could not prevail on this claim. Second, the siblings argue that the success of

the farm was based on years of effort and contribution by everyone in the family. They rely on the trial court's findings regarding Dwayne's payment of back taxes, the contribution of labor by all of the siblings to keep the farm operational, and the siblings' assistance during the 1978 boundary dispute. All of these contributions, they contend, support a finding of unjust enrichment because their efforts were undertaken in reliance on their belief that the land was being held in trust for their benefit.

¶ 19 We conclude that the district court's findings were sufficient to support imposition of a constructive trust. In deciding that the findings of fact regarding Arnold's intent foreclosed the siblings from prevailing on a claim of unjust enrichment, the court of appeals erred. The trial court acted within the bounds of its discretion in imposing a constructive trust. Therefore, we reverse the judgment of the court of appeals.

## STANDARD OF REVIEW

¶ 20 When reviewing cases pursuant to a writ of certiorari, this court reviews the decision of the court of appeals, not that of the district court.[18] The court of appeals' holding that the siblings could establish neither an oral express trust nor unjust enrichment is a legal determination that we review for correctness.[19]

¶ 21 With regard to the imposition of a constructive trust, the availability of such a remedy is also a question of law reviewed for correctness.[20] But if such a remedy is available, the "'trial court is accorded considerable latitude and discretion in applying and formulating an equitable remedy, and [it] will not be overturned unless it [has] abused its discretion.'"[21]

12. *Id.*

13. *Id.* ¶ 20.

14. *Id.* ¶ 22.

15. *Id.*

16. *Id.*

17. *Id.* ¶ 23.

18. *See State v. Cahoon*, 2009 UT 9, ¶ 10, 203 P.3d 957.

19. *See Frito–Lay v. Utah Labor Comm'n*, 2009 UT 71, ¶ 15, 222 P.3d 55.

20. *Ockey v. Lehmer*, 2008 UT 37, ¶ 42, 189 P.3d 51 (citing *Thurston v. Box Elder County*, 892 P.2d 1034, 1040–41 (Utah 1995)).

21. *Id.* (alterations in original) (quoting *U.S. Fuel Co. v. Huntington–Cleveland Irrigation Co.*, 2003 UT 49, ¶ 9, 79 P.3d 945).

■ ¶ 22 Finally, because "[u]njust enrichment must remain a flexible and workable doctrine.... we afford broad discretion to the trial court in its application of unjust enrichment law to the facts." [22]

## ANALYSIS

¶ 23 The siblings contend that the trial court was correct in imposing a constructive trust, either as a means of giving effect to an oral express trust, or as a means of remedying unjust enrichment. Thus, they argue that the court of appeals erred in two ways. First, they argue that the court of appeals misinterpreted the trial court's findings of fact and that these findings actually demonstrate Arnold's intent to create a trust to benefit the family. Second, they argue that the trial court was correct in finding that Donald had been unjustly enriched and that the court of appeals erred in holding otherwise. As such, they claim that the trial court had discretion to award a constructive trust under either theory.

■ ¶ 24 In addressing the siblings' claims, we keep a number of important principles in mind. First, we affirm our prior statement that " 'the forms and varieties of these trusts ... are practically without limit.' " [23] We also note that, in cases involving transfers of land, imposing a constructive trust will often "alter a deed or other writing which is regular in form and is presumed to convey a clear and unambiguous title." [24] We have recognized that altering deeds in this way may make it difficult for a landowner to "rest in the security of his title to property, however solemn might be the instrument on which it was founded." [25] To

mitigate this effect, we require that the evidence offered to overcome a deed must be "clear and convincing." [26]

■ ¶ 25 Even given this elevated burden of proof, we agree with the siblings with regard to their claim for unjust enrichment. First, we hold that the court of appeals incorrectly determined that the siblings must succeed or fail based solely on the intent underlying Arnold's transfer of land. Rather, a claim for an oral express trust is independent from a claim for unjust enrichment, and either claim may support imposition of a constructive trust. Second, because unjust enrichment is a flexible doctrine and because trial courts have broad discretion in fashioning remedies for unjust enrichment, we hold that the court of appeals erred in reversing the trial court's award of a constructive trust. Because we affirm the trial court's finding of unjust enrichment and its imposition of a constructive trust on that basis, we need not determine whether the siblings also could have prevailed in their attempt to establish an oral express trust. In order to explain our conclusions, we find it useful to articulate the legal standards for the types of constructive trust at issue in this case.

## I. CONSTRUCTIVE TRUSTS ARE A REMEDY THAT MAY BE IMPOSED WHERE A PARTY HAS BEEN UNJUSTLY ENRICHED OR WHERE NECESSARY TO GIVE EFFECT TO AN ORAL EXPRESS TRUST

■ ¶ 26 The siblings argue that a constructive trust may be imposed under either of two distinct causes of action. One is a cause of action to establish an oral express

22. *Jeffs v. Stubbs,* 970 P.2d 1234, 1245 (Utah 1998).

23. *Parks v. Zions First Nat'l Bank,* 673 P.2d 590, 597 (Utah 1983) (alteration in original) (quoting *Fitz–Gerald v. Hull,* 150 Tex. 39, 237 S.W.2d 256, 263 (1951)). We do not intend to suggest that the legal theories discussed herein are the only valid bases for imposing constructive trusts. We have no need to, and do not, consider the other circumstances wherein a constructive trust would be an appropriate remedy or what shape such a remedy might take. *See, e.g., Parduhn v. Bennett,* 2002 UT 93, ¶ 17, 61 P.3d 982 (discussing availability of a constructive trust as a remedy, under Utah Code Ann. § 31A–21–104(5)

(1999), when an otherwise valid insurance policy is held by one who lacks an insurable interest).

24. *In re Estate of Hock,* 655 P.2d 1111, 1114 (Utah 1982).

25. *Jewell v. Horner,* 12 Utah 2d 328, 366 P.2d 594, 598 (1961) (quoting *Chambers v. Emery,* 13 Utah 374, 45 P. 192, 195 (1896)).

26. *Id.* at 597. *See also Parks,* 673 P.2d at 596; *Nielson v. Rasmussen,* 558 P.2d 511, 513 (Utah 1976); *Hansen v. Hansen,* 110 Utah 222, 171 P.2d 392, 394–95 (1946).

trust. The other is a claim for unjust enrichment. Oral express trusts have "certain fundamental characteristics" in common with traditional trusts because, like traditional trusts, they are the manifestation of a settlor's intent with regard to property.[27] The main such characteristic is the imposition of obligations on a trustee "to act for the benefit of [beneficiaries] as to matters within the scope of the [trust]."[28] Like trusts created by a valid writing, constructive trusts imposed to give effect to oral express trusts are adequately characterized as " 'a fiduciary relationship with respect to property, arising as a result of a *manifestation of an intention to create it* and subjecting the person in whom the title is vested to equitable duties to deal with it for the benefit of others.' "[29]

¶ 27 Where a transfer of land was made with the intent to create such a trust, the trust will generally fail unless evidenced by a writing that complies with the Statute of Frauds.[30] Because oral express trusts do not meet these requirements, they will only be given effect in "certain circumstances."[31] In these instances, the constructive trusts are deemed to "arise[ ] by operation of law and [are] not within the statute of frauds."[32]

¶ 28 We have recognized that constructive trusts may be imposed in the circumstances set forth in section 45 of the Restatement (Second) of Trusts (the "Restatement of Trusts").[33] This section applies when the transferor of land intends for the transfer to benefit someone other than the transferor or the transferee:

(1) Where the owner of an interest in land transfers it inter vivos to another in trust for a third person, but no memorandum properly evidencing the intention to create a trust is signed, as required by the Statute of Frauds, and the transferee refuses to perform the trust, the transferee holds the interest upon a constructive trust for the third person, if, but only if,

(a) the transferee by fraud, duress or undue influence prevented the transferor from creating an enforceable interest in the third person, or

(b) the transferee at the time of the transfer was in a confidential relation to the transferor, or

(c) the transfer was made by the transferor in anticipation of death.[34]

In short, the imposition of a constructive trust under this section of the Restatement of Trusts requires proof that the transferor of land intended to create a trust and that one of the three identified circumstances existed at the time of the transfer. And where proving this intent will be contrary to an otherwise valid deed, the evidence of the trust must be clear and convincing.[35]

¶ 29 As with claims based on an oral express trust, claims of unjust enrichment can support the imposition of a constructive trust.[36] To this end, we have

---

27. *Parks,* 673 P.2d at 598.

28. Restatement (Second) of Trusts § 2 cmt. b (1959).

29. *Parks,* 673 P.2d at 598 (quoting 5 A. Scott, *The Law of Trusts* § 462.1 (1967)).

30. *See* Utah Code Ann. § 25–5–1 (2007).

31. *See Haws v. Jensen,* 116 Utah 212, 209 P.2d 229, 231 (1949).

32. *Id.*

33. *See Ashton v. Ashton,* 733 P.2d 147, 151 (Utah 1987); *Parks,* 673 P.2d at 597–98; *Nielson v. Rasmussen,* 558 P.2d 511, 513 (Utah 1976); *Haws,* 209 P.2d at 231–32. We have also adopted section 44 of the Restatement of Trusts. *See Parks,* 673 P.2d at 597–98 & n. 12; *Taylor v. Turner,* 27 Utah 2d 39, 492 P.2d 1343, 1346 (1972). Section 44 applies where the transferor intends to establish a trust for the benefit of himself. *Id.; see* Restatement (Second) of Trusts § 44. Where a party relies on section 44, the third circumstance justifying imposition of a constructive trust is different than the relevant circumstances under section 45. *See id.* § 44(1)(c). The party may not prevail by showing that the transfer was made in anticipation of death (as is the standard under section 45), but may prevail by showing that "the transfer was made as security for the indebtedness of the transferor." *Id.* Because the siblings argue that they are the intended beneficiaries, section 44 does not apply here.

34. Restatement (Second) of Trusts § 45 (1959).

35. *See Jewell v. Horner,* 12 Utah 2d 328, 366 P.2d 594, 597 (1961).

36. *See Jeffs v. Stubbs,* 970 P.2d 1234, 1253 (Utah 1998) (upholding court's equitable ruling that imposed constructive trust to remedy unjust enrichment); *Parks,* 673 P.2d at 600.

adopted the formulation set forth at section 160 of the Restatement of Restitution: "a constructive trust may arise 'where a person holding title to property is subject to an equitable duty to convey it to another on the ground that he would be unjustly enriched if he were permitted to retain it....'"[37] A claim for unjust enrichment in Utah requires proof of three elements:

> "(1) a benefit conferred on one person by another; (2) an appreciation or knowledge by the conferee of the benefit; and (3) the acceptance or retention by the conferee of the benefit under such circumstances as to make it inequitable for the conferee to retain the benefit without payment of its value."[38]

We have also noted that unjust enrichment plays an important role as a tool of equity: "[u]njust enrichment law developed to remedy injustice when other areas of the law could not," and therefore "must remain a flexible and workable doctrine."[39]

¶ 30 Because of the flexible nature of the unjust enrichment doctrine, a constructive trust is an available remedy even in cases where a plaintiff might assert alternative legal theories to support imposition of a constructive trust. Nothing about the constructive trust that is imposed to give effect to an oral express trust does anything to preclude the imposition of a constructive trust as a remedy to prevent unjust enrichment.

¶ 31 Indeed, in *Parks v. Zions First National Bank,* the plaintiff brought claims under sections 44 and 45 of the Restatement of Trusts, as well as a claim for unjust enrichment.[40] Although the trial court found the plaintiff's claim was not one for an oral express trust, we affirmed the trial court's finding of unjust enrichment and its decision to impose a constructive trust as a remedy.[41] We also explicitly rejected the notion that a party seeking to prove the existence of an oral express trust could not, where the facts would support it, also seek recovery under a theory of unjust enrichment.[42] Thus, our cases establish the availability of both types of constructive trust sought in this case. And where the facts and law will support it, a plaintiff may alternatively pursue both kinds of constructive trust within the same lawsuit.

¶ 32 Having articulated the law as it relates to the siblings' claims, we now address the issue presented in this case: whether the court of appeals erred in reversing the trial court's imposition of a constructive trust. Because of the manner in which the court of appeals resolved the issue, we first turn to the court of appeals' conclusion regarding oral express trusts, and then examine the court of appeals' conclusion regarding unjust enrichment.

## II. THE COURT OF APPEALS ERRED IN BASING ITS CONCLUSION SOLELY ON WHETHER ARNOLD INTENDED TO CREATE AN ORAL EXPRESS TRUST

¶ 33 The court of appeals incorrectly concluded that, because the trial court's findings did not support an oral express trust, the siblings could not prevail on a theory of unjust enrichment. As discussed, our prior cases reveal two distinct legal causes of action that the siblings were free to pursue in this case. To the extent they have alleged that Arnold intended to create a trust that would inure to their benefit, they have stated a claim consistent with the cause of action set forth at section 45 of the Restatement of Trusts. If the siblings successfully proved this case, the trial court could have imposed a constructive trust on the farm property to give effect to Arnold's intent. To the extent that the siblings have argued that Donald wrongfully retained the benefits of their contributions to the farm property, they seek a remedy for unjust enrichment.

---

37. *Parks,* 673 P.2d at 599 (alteration in original) (quoting Restatement of Restitution § 160 (1937)).

38. *Jeffs,* 970 P.2d at 1247–48 (quoting *Am. Towers Owners Ass'n v. CCI Mech., Inc.,* 930 P.2d 1182, 1192 (Utah 1996)).

39. *Id.* at 1245.

40. 673 P.2d at 598–99.

41. *Id.* at 600.

42. *See id.* at 597.

Where a party has successfully proven its case for unjust enrichment, the trial court has authority to impose a constructive trust as a remedy.

¶ 34 In reviewing our prior cases and the court of appeals' opinion in this case, we are satisfied that the court of appeals articulated these legal standards correctly, but that it misconstrued the relationship between these causes of action. It determined that the siblings had attempted to use the law of unjust enrichment as a substitute for the law of oral express trusts.[43] As such, it determined that the law imposed upon it a binary choice: either Arnold intended that Donald take the land as trustee, or the actions Donald took during his years of ownership were not unjust.[44]

¶ 35 In fact, there is the potential for significant overlap in this case. If Arnold intended that Donald take the land as trustee, then it was both inequitable *and* a violation of the intended trust for Donald to retain for himself benefits that should have flowed to the trust. In such a case, a constructive trust imposed to give effect to the oral trust would also have remedied the related unjust enrichment. But even if the siblings could not prove Arnold's intent to create such a trust, Donald's actions, as found by the trial court, are the sort that would also support a claim of unjust enrichment. Assuming the siblings prevailed on this theory, the constructive trust would not be imposed to give effect to Arnold's intent; it would be imposed to give effect to the judgment of a court, sitting in equity, regarding how best "to remedy injustice when other areas of the law [can] not."[45]

¶ 36 The court of appeals' departure from our case law appears to be the result of its reliance on a single finding of fact interpreted in isolation. In its findings of fact, the trial court states that "Arnold did not consider the conveyance to be a transfer of his ownership rights in the property." In its conclusions of law, the trial court reinforces this point: "The deed transfer was for accommodation and not intended to transfer ownership rights to Donald." The court of appeals equated this finding with a finding that Arnold "did not intend to transfer the farm into trust."[46] Thus, it concluded that this finding precluded any oral express trust and that a constructive trust therefore could not be imposed.[47]

¶ 37 The siblings argue that the court of appeals simply misinterpreted this finding of fact, and that it should be understood to mean that Arnold intended to transfer only legal title to Donald, while establishing a beneficial interest for the family. The siblings' urged interpretation is consistent with general trust principles: "The fundamental nature of a trust is the division of title, with the trustee being the holder of legal title and the beneficiary that of equitable title."[48] Thus, every time a settlor creates a trust there is some interest in the trust res that is *not* transferred to the trustee.[49] In fact, if ever the trustee also becomes the sole beneficiary, all interests in the trust property will reside in the trustee and legal and equitable title will merge.[50] So, for Arnold to have intended to create a trust, he necessarily would have intended to convey to Donald something less than his full ownership rights. Otherwise, no equitable interest would be held on behalf of the beneficiaries.

¶ 38 The siblings also urge that the court of appeals' interpretation of this finding of fact is an unreasonable construction of the

---

43. *Rawlings v. Rawlings*, 2008 UT App 478, ¶ 18, 200 P.3d 662.

44. *Id.* ¶ 19.

45. *Jeffs v. Stubbs*, 970 P.2d 1234, 1245 (Utah 1998).

46. *Rawlings*, 2008 UT App 478, ¶ 22, 200 P.3d 662.

47. *Id.* ¶¶ 22–23.

48. 76 Am.Jur.2d *Trusts* § 1 (2005).

49. *See In re Estate of Flake*, 2003 UT 17, ¶ 11, 71 P.3d 589 ("There must be an intent by the settlor to confer a beneficial interest in the property *in some other person.*" (emphasis added)).

50. *See* Restatement (Second) of Trusts § 341(1) (1959) ("[I]f the legal title to the trust property and the entire beneficial interest become united in one person who is not under an incapacity, the trust terminates.").

trial court's judgment. After all, the siblings note, the court of appeals' disposition of the case upheld Donald's ownership of the land.[51] The siblings argue that this is absurd because it is directly contrary to the finding of fact on which the court of appeals relied. Given the alternative, they argue that the court of appeals had a duty to interpret the trial court's findings in a manner favorable to its judgment.

¶ 39 Regardless of the merits of these arguments, if the siblings are to prevail on the theory that Arnold intended to create an oral express trust, the siblings must not only overcome this ambiguous finding of fact, they must also establish one of the other circumstances set forth in section 45 of the Restatement of Trusts.[52] They urge us to find that Donald stood in a confidential relationship with respect to Arnold. There are some findings of fact—relating to Arnold's deteriorating health, his anxiety regarding welfare coverage, and Donald's role in the property transfer—that may support the conclusion that Donald and Arnold had a confidential relationship. But there are also findings of fact that suggest otherwise—LaRell and Dwayne both occupied positions of trust vis a vis their father and participated in discussions about how best to handle the land transfer.[53] The trial court's conclusions of law do not address whether Donald's relationship with his father met our standard for a confidential relationship. Further, unresolved issues remain regarding the terms of the trust, including how Arnold's interest would have descended after his death.[54]

¶ 40 We decline to address these questions for the first time on appeal. It is sufficient for our purposes to say that the court of appeals erred when it concluded that the siblings' failure to prove an oral express trust necessarily precluded a finding in their favor under a theory of unjust enrichment. Because the two claims may be pursued independently, we need not determine whether the trial court's findings might support a claim under section 45 of the Restatement of Trusts. Rather, as will be discussed below, the court of appeals erred in reversing the trial court's finding of unjust enrichment and its imposition of a constructive trust as a means of remedying this unjust enrichment.

## III. THE COURT OF APPEALS ERRED IN HOLDING THAT DONALD WAS NOT UNJUSTLY ENRICHED BY THE CONTRIBUTIONS HIS SIBLINGS MADE TO THE FARM PROPERTY OVER SEVERAL DECADES

¶ 41 The court of appeals held that because Donald was the transferee under a deed, his acceptance of his siblings' contributions to the land could not be unjust.[55] In so holding, the court of appeals erred. The standard for determining whether a person has been unjustly enriched requires a court to determine whether the defendant accepted and retained benefits conferred by the plaintiff under such circumstances as to make it inequitable for the

---

**51.** *Rawlings*, 2008 UT App 478, ¶ 23, 200 P.3d 662.

**52.** *See supra* note 34 and accompanying text.

**53.** In *Baker v. Pattee*, 684 P.2d 632, 636–37 (Utah 1984), we described confidential relationships as being, at least in part, a function of inequality between the parties. So, to the extent that the circumstances surrounding the transfer enhanced Donald's influence over his father, it was also likely mitigated by the similarly close, though perhaps not quite equivalent, relationships LaRell and Dwayne occupied with respect to their father.

**54.** *See Hiltsley v. Ryder*, 738 P.2d 1024, 1025–26 & n. 5 (Utah 1987) (requiring joinder of a decedent's estate before adjudicating the terms of a

constructive trust that would inure to the benefit of the decedent's estate). Donald urges us to affirm the court of appeals on the alternative ground that any trust would necessarily have included Arnold and Cleo—who were not joined in this suit—as beneficiaries. While joinder may have been required to adjudicate all of the interests allegedly created by Arnold's oral express trust, the siblings' claims for unjust enrichment are based on benefits *they* conferred on Donald, and are therefore wholly independent of any similar claim that might be advanced by Cleo or Arnold's estate. Thus, it is not fatal to the siblings' claim for unjust enrichment that neither Arnold's estate nor Cleo were made parties to this lawsuit.

**55.** *Rawlings v. Rawlings*, 2008 UT App 478, ¶ 17, 200 P.3d 662.

defendant to retain those benefits without compensating the plaintiff.[56]

¶ 42 The court of appeals' conclusion does not adequately take into consideration the circumstances under which Donald accepted many of the benefits conferred by his siblings. As found by the trial court, the reason the siblings continued to work on the trust property after Arnold's death was that Donald led them to believe it was their "Mother's farm." Dwayne paid $1,000 in property taxes with the understanding that *Arnold* needed the money. He did not intend to pay off taxes on land that would soon be owned by Donald. And when the siblings relinquished their interests via the 1978 quitclaim deed and contributed other parcels of land to the farm property, they did so with the understanding that they were assisting in clearing up title problems so that Donald could litigate the dispute on their behalf. The trial court found all of these benefits, along with "other benefits from the use and negotiations relative to the trust property," to be conferred under circumstances that gave rise to unjust enrichment.

¶ 43 We hold that these findings were sufficient to support the trial court's imposition of a constructive trust. The first element of a claim for unjust enrichment—that the siblings confer a benefit on Donald—has clearly been met. Further, as to the second element, there can be no doubt that Donald was aware of these benefits. He acknowledged in his testimony that he knew that all of the siblings were contributing to the maintenance of the farm property even though he was not. He redistributed small amounts of the settlement proceeds to his siblings while keeping the bulk for himself. And he prompted Dwayne to pay $1,000 toward the property taxes and made no attempt to return the money after Arnold executed the deed purporting to transfer the land to Donald.

¶ 44 The dispute in this case centers on the third element of a claim for unjust enrichment. The trial court found that, for decades, Donald represented to his siblings that the farm property was being used to support their mother. Their contributions to the farm's operation were made because they believed these representations. Arnold's management of the farm in the years prior to his death reinforced the idea that the farm was considered a family farm.

¶ 45 In a manner consistent with our precedent, we decline to weigh for ourselves the relative equities of these actions. In *Jeffs v. Stubbs*, we announced our rationale for granting trial courts broad discretion in imposing constructive trusts to remedy unjust enrichment.[57] The reasons for granting broad discretion articulated in *Jeffs* play an important role in this case. First, determining whether the circumstances surrounding the parties' interactions were inequitable is a fact-intensive process for which trial courts are uniquely suited.[58] The nature of this equitable determination requires balancing the ramifications of an entire course of conduct. The trial court, having heard all of the evidence in context, is in the best position to undertake this balancing. Second, cases of unjust enrichment require the trial judge to "observe[ ] 'facts,' such as a witness's appearance and demeanor, relevant to the application of the law that cannot be adequately reflected in the record available to appellate courts."[59] We are keenly aware that trial courts are in the best position to make determinations about credibility and veracity. This is especially the case where, as here, the legal standard being applied requires the court to determine what is equitable. We are also mindful that all of these observations

---

**56.** *See Jeffs v. Stubbs*, 970 P.2d 1234, 1247–48 (Utah 1998).

**57.** 970 P.2d at 1244–45. Because some of the land at issue in *Jeffs* was situated in Arizona, we are aware that much of our analysis in that case concerned the unjust enrichment law of Arizona. *See id.* at 1243. But our holding regarding the discretion a trial court should be afforded in an unjust enrichment case was based on Utah law, and did not depend on the substantive differences, if any, between the unjust enrichment standards employed in Utah and Arizona. *See id.* at 1244–45.

**58.** *See id.* at 1244–45.

**59.** *Id.* at 1244 (internal quotation marks omitted).

will not necessarily be included in the record on appeal.

¶ 46 In *Jeffs*, these considerations led us to conclude that we must "afford broad discretion to the trial court in its application of unjust enrichment law to the facts." [60] We reaffirm that conclusion here.[61]

¶ 47 The court of appeals' decision does not appropriately defer to the trial court's judgment with regard to the claim for unjust enrichment. Specifically, the court of appeals concluded that the trial court had grafted equitable considerations into its inquiry regarding Arnold's intent to create an oral express trust.[62] But in so concluding, the court of appeals rejected the theory of unjust enrichment as a valid, alternative, and independent theory on which the trial court's imposition of a constructive trust could legitimately rest.

60.  *Id.* at 1245.

61.  Our analysis in *Jeffs* was an application of a test announced in *State v. Pena*, 869 P.2d 932, 938–39 (Utah 1994).  *See Jeffs*, 970 P.2d at 1244–45.  We have subsequently modified this test by eliminating a separate factor that analyzed whether it was difficult to identify the "outcome determinative" considerations underlying a body of law.  *See State v. Levin*, 2006 UT 50, ¶ 29, 144 P.3d 1096 (internal quotation marks omitted). Although we found that portion of the analysis to be unworkable, we noted that "in the rare instances where [it] may be important, it could fall under the umbrella of other policy considerations."  *Id.* ¶ 30.  For this reason, we do not believe that our reformulated version of this test would have led to a different result in *Jeffs*.  Nor do we believe it mandates a different result here.

62.  *Rawlings v. Rawlings*, 2008 UT App 478, ¶ 18, 200 P.3d 662.  The court of appeals also employed a standard for finding unjust enrichment that differs slightly from the test we have articulated in this opinion.  We are unable to discern whether this impacted the court of appeals' conclusion, but given our disposition under the correct standard, we need not examine whether the court of appeals was led astray by use of this different standard.  To avoid future confusion, we take this opportunity to address the appropriate circumstances for use of the standard employed by the court of appeals.

Relying on our statements in *Wilcox v. Anchor Wate Co.*, the court of appeals stated, " '[c]ourts recognize a constructive trust as a matter of equity where there has been (1) a wrongful act, (2) unjust enrichment, and (3) specific property that can be traced to the wrongful behavior.' " *Rawlings*, 2008 UT App 478, ¶ 16, 200 P.3d 662 (quoting *Wilcox v. Anchor Wate*, 2007 UT 39, ¶ 34, 164 P.3d 353).  Instead of discussing Donald's actions in terms of whether his retention of benefits was inequitable, the court of appeals examined whether Donald's conduct was "wrongful" within the meaning of this test.  *Id.* ¶¶ 16–17.  Since this standard requires unjust enrichment *and* a wrongful act, it suggests that unjust enrichment, by itself, will not support a constructive trust.  This is incorrect.

*Wilcox* involved a situation where an insurer was forced into involuntary liquidation.  *See Wilcox*, 2007 UT 39, ¶ 7, 164 P.3d 353.  The insurer had paid Anchor Wate's claim under circumstances that constituted a preferential transfer under the Utah Insurers Rehabilitation and Liquidation Act. *See id.* ¶¶ 7–9.  Such a payment is roughly analogous to a preferential payment to one creditor at the expense of other creditors in the context of bankruptcy.  *See id.* ¶ 11.

Anchor Wate argued that, by permitting the insurer to pay less than the full value of Anchor Wate's claim, the insurer was unjustly enriched. *See id.* ¶¶ 34–38.  Drawing on the bankruptcy analogy, we stated

"[w]henever a debtor retains a benefit afforded it by a creditor without paying that creditor in full, the estate is arguably 'unjustly enriched.' Yet this situation is a result of a ... policy choice incorporated into [our statutes], and born of the reality that an insolvent debtor, by definition, is unable to satisfy in full the debts owed to its creditors.  In light of this ... policy choice and the reality that other similarly situated creditors are also receiving less than full payment of their claims, ... retention of the [d]isputed [f]unds subject to pro-rata distribution is not 'unjust' under the circumstances."

*Id.* ¶ 36 (first alteration in original) (quoting *First Sec. Bank of Utah v. Gillman*, 158 B.R. 498, 507–08 (D.Utah 1993)).

We take this opportunity to clarify our articulation of the rule in *Wilcox*.  The requirement of a "wrongful act" was a response to the unique nature of the claims in that case, and the concession that *unjust* enrichment arguably occurs whenever a debtor's obligations are discharged by operation of law.  *See id.* ¶ 34 (citing bankruptcy cases as the authority for employing this standard); *see also id.* ¶ 11 (looking to bankruptcy law for guidance because "federal bankruptcy law and the voidable preference provisions of the Liquidation Act share the common purpose of effectuating proportionate distribution of the debtor's assets among its creditors" (internal quotation marks omitted)).  In such situations, we will not impose a constructive trust absent a showing of a "wrongful act."  Without the unique considerations present in a preferential transfer case, or a closely analogous case, we reaffirm our position that unjust enrichment, in the traditional sense of an inequitable retention of benefits, will support imposition of a constructive trust, even absent wrongful conduct.

¶ 48 Further, the court of appeals concluded that "the only wrongful act alleged by the Siblings is [Donald's] failure to comply with Arnold's expressed intentions." [63] But this clearly conflicts with the trial court's findings regarding the siblings' contributions to the farm property and their understanding that Donald was acting in their interests. Even if Donald was the legitimate owner of this property at all times after the 1967 transfer, he was not unequivocally entitled to retain the fruits of his siblings' labor on the farm, the amount of tax payments Dwayne made with the understanding they would be used for Arnold's benefit, the value of the property transferred under the siblings' quitclaim deeds, the settlement proceeds from the 1978 dispute that were retained by Donald, and contributions by the siblings of other property to Donald.

¶ 49 *Jeffs* is instructive on this point as well. In that case, the United Effort Plan Trust (the "UEP") owned title to land.[64] Members of a religious group affiliated with the trust were permitted to occupy the land.[65] The UEP encouraged these occupants to make improvements to the land by leading them to believe they could occupy the land for their lifetimes.[66] After they were removed from the land, the occupants brought a number of claims, including claims for unjust enrichment, against the UEP.[67] The UEP defended on the grounds that, because the occupants knew the UEP held title to the land when they made improvements, it was not unjust for the UEP to keep those improvements even after the occupants were no longer permitted to reside on the land.[68] Relying on the Restatement of Restitution, we rejected the UEP's position, and held that "an owner 'cannot retain a benefit which knowingly he has permitted another to confer upon him by mistake.'" [69] The Restatement position carries even more force in this case because here, unlike in *Jeffs*, the siblings did not know for decades that Don-

ald claimed title to the land. Put simply, even if the court of appeals correctly concluded that Donald owned the farm property, this did not insulate Donald's conduct from being inequitable.

¶ 50 Thus, the court of appeals erred in reversing the trial court's judgment that Donald had been unjustly enriched. The trial court found that a number of benefits had been conferred on Donald by the siblings because of the siblings' understanding that the land was being used as a family farm. Rather than assert his ownership of the land, Donald accepted and retained these benefits. Given the broad discretion that we afford trial courts when they apply the law to the facts in unjust enrichment cases, we hold that the court of appeals erred in reversing the trial court's judgment. The trial court's legal conclusion was not absolutely precluded as the court of appeals determined, but was adequately supported. We therefore reverse the judgment of the court of appeals, and affirm the trial court's imposition of a constructive trust in favor of the siblings.

## CONCLUSION

¶ 51 We hold that the trial court acted within the bounds of its discretion in imposing a constructive trust in favor of the siblings. Unjust enrichment is a cause of action separate from an attempt to prove the existence of an oral express trust. Thus, even if the siblings have failed to prove the existence of an oral express trust in this case, something we assume without deciding, they were still free to pursue their claim of unjust enrichment as an independent cause of action. The trial court explicitly found that Donald had been unjustly enriched, and numerous of its factual findings support that judgment. Given the broad discretion that must necessarily be afforded trial courts when they apply the law of unjust enrich-

63. *Rawlings,* 2008 UT App 478, ¶ 17, 200 P.3d 662.

64. *See Jeffs,* 970 P.2d at 1239–40.

65. *See id.*

66. *See id.*

67. *See id.* at 1239.

68. *See id.* at 1246.

69. *Id.* at 1247 (quoting Restatement of Restitution § 40 cmt. d (1937)).

ment to the facts of a given case, we disagree with the court of appeals' conclusion that imposition of a constructive trust was not an available or appropriate remedy in this case. The judgment of the court of appeals is therefore reversed.

¶ 52 Chief Justice DURHAM, Justice WILKINS, Justice PARRISH, and Justice NEHRING concur in Associate Chief Justice DURRANT's opinion.