# FILED

February 5 2013

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

DA 12-0010

IN THE SUPREME COURT OF THE STATE OF MONTANA

2013 MT 24

THE NORTHERN CHEYENNE TRIBE, a
Sovereign Indian Tribe of the United
States and as a Nation of People, both
Individually and Collectively,

Plaintiff and Appellant,

v.

THE ROMAN CATHOLIC CHURCH; by
and through its Corporate and other
Business Entities, to include, but not
limited to, THE DIOCESES OF GREAT
FALLS/BILLINGS; ST. LABRE INDIAN
SCHOOL EDUCATIONAL ASSOCIATION,
INC., ST. LABRE HOME FOR INDIAN
CHILDREN AND YOUTH, INC., and
JOHN DOES I-X,

Defendants and Appellees.

APPEAL FROM:    District Court of the Thirteenth Judicial District,
                In and For the County of Yellowstone, Cause No. DV 05-0286
                Honorable Susan P. Watters, Presiding Judge

COUNSEL OF RECORD:

        For Appellant:

                Jackie S. Shields; A. Clifford Edwards; Triel D. Culver; A. Christopher
                Edwards; Edwards, Frickle & Culver, Billings, Montana

        For Appellees:

                Maxon R. Davis; Jeffry M. Foster; Davis, Hatley, Haffeman & Tighe,
                P.C., Great Falls, Montana (Diocese)
                Herbert I. Pierce, III, Jeffery J. Oven, Crowley Fleck PLLP, Billings,
                Montana

Submitted on Briefs:  August 29, 2012
Decided:   February 5, 2013

Filed:

_____
Clerk

Justice Brian Morris delivered the Opinion of the Court.

¶1 The Northern Cheyenne Tribe (NCT) appeals from an order of the Thirteenth Judicial District Court, Yellowstone County that granted summary judgment on all of NCT's claims. We affirm in part, reverse in part, and remand.

¶2 Our resolution of NCT's appeal requires us to address the following issues:

¶3 *Whether the District Court properly granted summary judgment to St. Labre on NCT's claims of unjust enrichment, constructive trust, and forensic accounting?*

¶4 *Whether the District Court properly granted summary judgment to St. Labre on NCT's claims of breach of contract, negligent misrepresentation, fraud, and wrongful conversion?*

¶5 *Whether the District Court properly granted judgment on the pleadings to St. Labre on NCT's cultural genocide and constitutional claims?*

## FACTS AND PROCEDURE

¶6 NCT brings its claims both individually, as a tribal entity, and collectively, on behalf of the Northern Cheyenne Tribal Members. NCT names "The Roman Catholic Church" as the lead defendant in the suit. NCT also names in the suit "The Roman Catholic Church by and through its Corporate and other Business Entities, to include, but not limited to, The Dioceses of Great Falls/Billings." We refer to these defendants collectively as "the Diocese."

¶7 NCT also names the St. Labre Indian School Education Association, Inc. and the St. Labre Home for Indian Children and Youth. St. Labre Indian School Educational Association, Inc. is a Catholic school that offers preschool through high school education.

3

St. Labre Home for Indian Children and Youth provides community support that includes housing to at-risk children who attend the St. Labre Indian School. Both entities appear to have the same interests in this suit and have been represented by the same counsel. We refer to the two entities collectively as "St. Labre."

¶8 A Catholic nun first claimed the majority of the land upon which St. Labre sits in April 1884, as grounds for the St. Labre Mission School. President Chester Alan Arthur issued an executive order to create a reservation for the "use and occupation of the Northern Cheyenne Indians in November 1884." President Arthur exempted from transfer to the Northern Cheyenne those lands "which have been located, resided upon, and improved by bona fide settlers, prior to the 1st day of October, 1884." St. Labre was settled approximately six months before the October 1, 1884 deadline.

¶9 President William McKinley issued an executive order to expand the size of the Northern Cheyenne Reservation in 1900. The order explicitly exempted from transfer tracts of land "belonging to the [St. Labre's] Mission." The United States Government later enacted the Northern Cheyenne Allotment Act (Act) in 1926. The Act reaffirmed the lands originally set out by President McKinley in 1900 to be the property of the Northern Cheyenne Indians and to be "for the permanent use and occupation of the Northern Cheyenne Indians."

¶10 Section 4 of the Act detailed exempted lands. These exempted lands included those used by St. Labre "so long as they continue to be used solely in the advancement of religious and welfare work for the benefit of the Northern Cheyenne Indians." The Secretary of the

4

Interior granted St. Labre's request in 1929 for "temporary use and occupancy" of 2.5 additional acres of land. St. Labre retains use of these lands.

¶11    The United States Government originally funded St. Labre based on the number of attending students. St. Labre closed its high school through the late 1930's and 1940's due to financial problems. Enrollment decreased to 41 students and St. Labre suffered a corresponding loss in aid.

¶12    St. Labre began a direct mail fundraising campaign in 1952 that aimed to offset its decrease in government funding. St. Labre has relied on this private fundraising almost exclusively since 1952. St. Labre raises millions of dollars annually. Its current endowment reaches approximately $90 million dollars. NCT alleges that St. Labre raised between $27 and $30 million for two of the four years before the filing of its complaint.

¶13    St. Labre runs its fundraising efforts through a direct mail campaign. St. Labre titled its fundraising letter associated with the direct mail campaign "*The Race of Sorrows*." An Army officer in the 1880's coined the phrase to characterize the Northern Cheyenne Tribe.

¶14    NCT asserts that St. Labre has raised millions of dollars through its fundraising efforts that market the plight and need of NCT. NCT submitted as exhibits a number of *The Race of Sorrows* letters. A fundraising letter from 1970 describes the purpose of St. Labre:

> Education of the young; opportunity of self-support for the adults, improvement of the economic and social status of the Northern Cheyenne, once called the Race of Sorrows because of their sorry plight, have been the goals of St. Labre, the only reasons for its existence.

Sample letters detail stories in which Northern Cheyenne parents seek aid with house payments and heating bills, children in need of shoes, and other similar depictions of impoverishment.

¶15 NCT and St. Labre have enjoyed a mixed relationship over the years. A commentator characterized the perception of NCT at the time of the development of St. Labre: "Cheyenne people viewed the priest as a means to improve their material condition on the reservation and as an intermediary who might speak for the Cheyenne people to federal officials." Suzanne H. Schrems, *The Northern Cheyennes and the Fight for Cultural Sovereignty*, Montana: The Magazine of Western History 18, 22 (Spring 1995). St. Labre has provided financial support to individual Tribal Members. NCT argues, however, that St. Labre's financial contributions have been irregular and insufficient relative to the fundraising totals that St. Labre has achieved.

¶16 St. Labre's disbursement of funds raised through its direct mail campaign appears to have served as a long-standing dispute between St. Labre and NCT. The District Court traced this dispute back to at least 1984 when NCT set up a task force to address the disbursement issue. The Tribal President sought an accounting from St. Labre in 1997. NCT alleged that St. Labre had been soliciting money "for and on behalf of the Northern Cheyenne people," but that the funds were not going regularly to NCT.

¶17 NCT asserts that St. Labre "consistently" made disbursements or donations to NCT whenever NCT demanded a right to a share of the funds. NCT claims that it always took issue with the timing and the amount of the disbursements from St. Labre. NCT alleges that St. Labre never actually refused to provide NCT with at least some access to these funds

until January 28, 2005. NCT argues that St. Labre's outright denial of access to these funds finally prompted NCT to file the current lawsuit. NCT filed this action on March 11, 2005.

¶18    NCT alleges nine separate causes of action in its amended complaint. We categorize these claims into three general groups. The first group involves allegations that St. Labre's fundraising system created a constructive trust on behalf of NCT. NCT alleges that St. Labre wrongfully has converted these funds to its own use, and, as a result, unjustly has enriched itself. NCT's second group of claims alleges contract and fraud type issues. The third group of claims alleges a constitutional tort in which St. Labre has committed cultural genocide against NCT in violation of Article II, Sections 3, 4, and 10 of the Montana Constitution.

¶19    The District Court granted St. Labre's motion for judgment on the pleadings on NCT's cultural genocide claim and its constitutional claims upon which NCT had predicated its cultural genocide claim. The District Court granted summary judgment on NCT's contract related claims due to NCT's failure to produce any evidence that an express or implied contract existed between NCT and St. Labre. The District Court also granted summary judgment on NCT's constructive trust claim and determined that the statute of limitations barred NCT's unjust enrichment claims that arose from St. Labre's fundraising that had taken place before March 2002. The District Court finally determined that NCT's failure to prove that NCT had suffered any loss barred its unjust enrichment claims that arose from St. Labre's fundraising after March 2002.

¶20    The District Court granted the Diocese's motion for summary judgment on all of NCT's claims based on "the same rational" that it had granted St. Labre's motions. NCT appeals.

## STANDARD OF REVIEW

¶21 We review for correctness a district court's grant for judgment on the pleadings. *Ritter v. Bill Barrett Corp.*, 2009 MT 210, ¶ 10, 351 Mont. 278, 210 P.3d 688. We review de novo a district court's grant of summary judgment. *Dubiel v. Mont. Dept. of Transp.*, 2012 MT 35, ¶ 10, 364 Mont. 175, 272 P.3d 66. Summary judgment represents an extreme remedy that should be granted only when no material factual controversy exists. *Mont. Metal Bldgs., Inc. v. Shapiro*, 283 Mont. 471, 474, 942 P.2d 694, 696 (1997). District courts need consider only admissible evidence when determining whether to grant a motion for summary judgment. *Hiebert v. Cascade County*, 2002 MT 233, ¶ 30-31, 311 Mont. 471, 56 P.3d 848. We review for correctness a district court's legal determinations. *Conner v. City of Dillon*, 2012 MT 21, ¶ 6, 364 Mont. 8, 270 P.3d 75.

## DISCUSSION

¶22 *Whether the District Court properly granted summary judgment to St. Labre on NCT's claims of unjust enrichment, constructive trust, and forensic accounting?*

¶23 NCT asked the District Court to place the funds raised by St. Labre over the past half-century in an "Equitable Trust," to allow a "proper redistribution in Equity." NCT further alleged that St. Labre's retention of millions of dollars without paying an equitable share to NCT "constitutes an unjust enrichment." In denying NCT's claim, the District Court focused on NCT's failure to establish that St. Labre had "done something wrong or taken advantage of the Tribe in some way" or that St. Labre had "retained a benefit to the loss of the Tribe."

8

¶24    The court specifically noted that "[NCT] has not presented any evidence of how it was damaged or sustained any loss because of St. Labre's references to the Northern Cheyenne [r]eservation or its condition in St. Labre's fundraising materials." The Court also stated that NCT "must show some element of misconduct or fault on the part of the defendant or that the defendant somehow took advantage of the [NCT]." St. Labre similarly argues on appeal that NCT failed to present any evidence that points to "any wrongdoing" by St. Labre.

**Unjust Enrichment Post-2002**

¶25    The District Court relied upon *Ragland v. Sheehan*, 256 Mont. 322, 327, 846 P.2d 1000, 1004 (1993), for the proposition that NCT needed to "show some element of misconduct or fault" on the part of St. Labre in order to establish a claim for unjust enrichment. This Court consistently has required some bad act or misconduct on the part of the defendant to support a claim for unjust enrichment that arose from an alleged implied contract. *Ragland,* 256 Mont. at 327, 846 P.2d at 1004; *Randolph V. Peterson, Inc. v. J.R. Simplot Co.*, 239 Mont. 1, 8, 778 P.2d 879, 883-884 (1989); *Brown v. Thorton*, 150 Mont. 150, 156, 432 P.2d 386, 391 (1967); s*ee also Est. of Pruyn v. Axmen Propane, Inc.*, 2009 MT 448, ¶ 64, 354 Mont. 208, 223 P.3d 845; *Hinebauch v. McRae*, 2011 MT 270, ¶ 29, 362 Mont. 358, 264 P.3d 1098. *Ragland* discussed unjust enrichment in the context of an alleged implied contract that sprang from the plaintiff's decision to change his legal position in reliance on an oral assurance from the defendant that the defendant intended to proceed with the purchase of an interest in a hydroelectric project. *Ragland*, 256 Mont. at 326-327, 846 P.2d at 1003-1004. *Ragland* cited *Peterson* to the same effect.

¶26 *Peterson* never actually analyzed, however, whether the defendant had engaged in misconduct or had taken advantage of the plaintiff due to Randolph V. Peterson, Inc.'s (RVP) (failure to establish that it deserved any commission from the sale of a mining shovel. The Court instead rejected contract and unjust enrichment claims based on the fact that the buyer had contacted the seller "fully three months before" the buyer was contacted by RVP. *Peterson*, 239 Mont. at 8, 778 P.2d at 884. RVP further conceded that the seller "probably would have been better off financially to have sold the shovel through RVP." *Peterson*, 239 Mont. at 9, 778 P.2d at 884.

¶27 *Brown*, in turn, involved a lapsed construction lien on property that resulted in the mortgagee obtaining clear title. *Brown*, 150 Mont. at 156-157, 432 P.2d at 390. The Court determined that the lienholder had to show "some element of misconduct or fault" by the mortgagee, or that the lienholder "was in some way taken advantage of." *Brown*, 150 Mont. at 156, 432 P.2d at 390 (citing *Butler v. Peters*, 62 Mont. 381, 205 P. 247 (1922)). The Court declined to blame the mortgagee for the fact that Brown had allowed his construction lien to lapse. *Brown*, 150 Mont. at 156, 432 P.2d at 390.

¶28 A party in *Butler* sought to attach the property of a corporate director based upon the corporation's failure to file its annual report. The Court refused to allow the attachment in light of the fact that "the complaint herein does not state a cause of action upon a contract, express or implied, for the direct payment of money" and thus the attachment statutes did not apply. *Butler*, 62 Mont. at 387, 205 P. at 249. *Butler* makes no mention of any requirement of misconduct or fault. In fact, *Butler* never directly applies the concept of unjust enrichment.

¶29 Like all of these other cases, *Butler* involves an alleged implied contract. Here NCT's claim for unjust enrichment arises from the alleged imposition of a constructive trust as opposed to an alleged implied contract. This Court has dispensed with the requirement that the plaintiff must establish that the defendant has engaged in some bad act or misconduct in order to prove a claim of unjust enrichment in the context of an alleged constructive trust. *In re Est. of McDermott*, 2002 MT 164, ¶¶ 25-26, 310 Mont. 435, 51 P.3d 486, clarified that Montana law no longer requires some wrongful act on the part of the defendant in order to establish a constructive trust.

¶30 A constructive trust instead arises when a person holding title to property "is subject to an equitable duty to convey it to another on the ground that the person holding title would be unjustly enriched if he were permitted to retain it." *McDermott*, ¶ 25 (quoting Section 72-33-219, MCA). Title 72, Chapter 33 broadly defines property to include "anything that may be the subject of ownership." Section 72-33-108(3), MCA. Section 72-33-219, MCA, makes no mention of a requirement of wrongdoing by the defendant in order to impose a constructive trust. The legislature's enactment of the Trust Code in 1989 eliminated the requirement that a showing of fraud or other wrongful acts constitutes a "prerequisite to imposing a constructive trust." *McDermott*, ¶ 25.

¶31 The Court in *McDermott* faced a claim for unjust enrichment that arose from a 1973 transaction that predated the legislature's 1989 adoption of the Trust Code. The legislature addressed these situations when it enacted Section 72-33-102(1), MCA. The statute expressly provides that the trust code applies to all trusts "regardless of when they were created." *McDermott*, ¶ 26. The Court affirmed the imposition of a constructive trust in

11

2001 on the proceeds from the sale of the real property that had been sold in 1972. *McDermott*, ¶ 28.

¶32 This Court previously recognized the broad discretion afforded by the principles of equity to impose a constructive trust. *Eckart v. Hubbard*, 184 Mont. 320, 325, 602 P.2d 988, 991 (1979), affirmed that the principles of equity allowed a court simply to declare a constructive trust "shall be [declared] to exist. Nothing else is required." The statutory trust scheme in effect in 1979 still required some sort of misconduct or wrongdoing on the part of the defendant in order to establish a constructive trust. *Eckart*, 184 Mont. at 326, 602 P.2d at 991. The Court nevertheless recognized that constructive trusts "occur where the parties have expressed no intent to create a trust." *Eckart*, 184 Mont. at 326, 602 P.2d at 991. A court creates a constructive trust "to work an equitable result." *Eckart*, 184 Mont. at 326, 602 P.2d at 991; s*ee also Lawrence v. Clepper*, 263 Mont. 45, 52-53, 865 P.2d 1150, 1155-1156 (1993) (confirming that the 1989 adoption of the Trust Code provides for imposition of a constructive trust when equity requires it).

¶33 Other jurisdictions have evolved to this approach. The court in *Simmonds v. Simmonds*, 380 N.E.2d 189, 194 (N.Y. 1978), recognized that "unjust enrichment, however, does not require the performance of any wrongful act by the one enriched. Innocent parties may frequently be unjustly enriched" (citations omitted). Unjust enrichment, as a concept of restitution, simply requires that "a party hold property under such circumstances that in equity and good conscience he ought not to retain it." *Simmonds*, 380 N.E.2d at 194 (citations and internal quotations omitted). A constructive trust serves to prevent unjust enrichment. Unjust enrichment, in the context of a constructive trust, "does not necessarily

12

implicate the performance of a wrongful act." *Counihan v. Allstate Ins. Co.*, 194 F.3d 357, 361 (2d Cir. 1999).

¶34     The Utah Supreme Court likewise has clarified that a party who asserts a claim of unjust enrichment need not establish any wrongful act. *Rawlings v. Rawlings*, 240 P.3d 754 (Utah 2010). Siblings argued in *Rawlings* that their older brother had been unjustly enriched by accepting their contributions to a family farm. The father had deeded the property to the older brother in what the siblings suggested was an attempt to create a constructive trust. The father had been diagnosed with cancer and the siblings contended that owning the property had made him ineligible for welfare assistance. The siblings alleged that the father had placed the property in their older brother's name so that the older brother could act as trustee for the property for the benefit of the family. *Rawlings*, ¶ 1.

¶35     The trial court found that the older brother for decades had represented to his siblings that the farm property was to be used to support their mother. The siblings contributed to the upkeep and maintenance of the farm property because they believed the older brother's representations. *Rawlings*, ¶ 10. The Utah Supreme Court approved the imposition of a constructive trust to avoid unjust enrichment to the older brother. The court reaffirmed its position that unjust enrichment "will support imposition of a constructive trust, even absent wrongful conduct." *Rawlings*, ¶ 47, fn. 62; s*ee also State ex rel. Palmer v. Unisys Corp.*, 637 N.W.2d 142, 150 (Iowa 2001) (determining that unjust enrichment supports restitution "with or without the existence of some underlying wrongful conduct").

¶36     The court further explained that a claim for unjust enrichment requires proof of three elements: "(1) a benefit conferred on one person by another; (2) an appreciation or

knowledge by the conferee of the benefit; and (3) the acceptance or retention by the conferee of the benefit under such circumstances as to make it inequitable for the conferee to retain the benefit without payment of its value." *Rawlings*, ¶ 29. The court emphasized that the concept of unjust enrichment plays an important role as a tool of equity: "unjust enrichment law developed to remedy injustice when other areas of the law could not," and, therefore, "must remain a flexible and workable doctrine." *Rawlings*, ¶ 29 (citations omitted).

¶37    NCT brings its claim for unjust enrichment in the context of an alleged constructive trust. The creation of a constructive trust "need not be limited to the person who obtained property by fraud or deception from another." *Lawrence*, 263 Mont. at 53, 865 P.2d at 1156. Thus a party's proof of unjust enrichment entitles it to restitution from the other party— regardless of any wrongdoing on the part of the unjustly enriched party. *Lawrence*, 263 Mont. at 53, 865 P.2d at 1156.

¶38    This approach conforms with the modern view that unjust enrichment serves as a unifying principle for a wide variety of equitable claims and that a court may order restitution to vindicate these types of equitable claims. Dan B. Dobbs, *Dobbs Law of Remedies: Damages-Equity-Restitution* vol. 1, § 4.1(3), 564 (Pract. Treatise Series, 2d ed., West 1993) [hereinafter *Law of Remedies*]. Under these circumstances, a court would measure restitution remedies "by the defendant's gain." Dobbs, *Law of Remedies* at § 4.1(1), 555. The plaintiff, in the context of a constructive trust, need not necessarily have been deprived of something in order to recover—it is sufficient that the defendant gained something that it should not be allowed to retain. *McDermott*, ¶ 26; *see also Restatement of Restitution* § 1 com. e (1937) (where "a benefit has been received by the defendant but the

14

plaintiff has not suffered a corresponding loss or, in some cases any loss, but nevertheless the enrichment of the defendant would be unjust . . . the defendant may be under a duty to give the plaintiff the amount by which [the defendant] has been enriched").

¶39 To summarize, the imposition of a constructive trust serves as a possible remedy to rectify the unjust enrichment of a party. The aggrieved party, in this instance, NCT, first must establish a claim of unjust enrichment in order for the court to consider the imposition of a constructive trust as a possible remedy for the unjust enrichment. We agree with the Utah court in *Rawlings* that NCT must establish the following elements to prove unjust enrichment: (1) a benefit conferred upon St. Labre by another, in this case by third-party donors moved by the plight of the NCT; (2) an appreciation or knowledge of the benefit by St. Labre; and (3) the acceptance or retention of the benefit by St. Labre under such circumstances that would make it inequitable for St. Labre to retain the benefit without payment of its value. *Rawlings*, ¶ 29; 66 Am. Jur. 2d *Restitution and Implied Contracts* § 11. NCT, as the aggrieved party, would not need to establish any wrongdoing on the part of St. Labre. *Lawrence*, 263 Mont. at 53, 865 P.2d at 1156. Finally, a claim for unjust enrichment, of the type asserted by NCT, should be limited to situations in which no other remedy exists. *Rawlings*, ¶ 29.

¶40 The District Court improperly required NCT to establish evidence of bad acts or wrongdoing on the part of St. Labre as an element of its claim of unjust enrichment in the context of a constructive trust. *See McDermott*, ¶ 25. We reverse the District Court's grant of summary judgment with respect to NCT's claims for unjust enrichment based upon St. Labre's fundraising efforts that took place after 2002. We remand this issue to the District

15

Court to allow NCT to develop its claim that St. Labre's fundraising appeals, that referred to the Northern Cheyenne Reservation, or the condition of the tribal people living there, require the imposition of a constructive trust on these funds raised from third-party donors for the benefit of NCT to avoid unjust enrichment to St. Labre. The District Court further must determine whether NCT has a right to possession of these funds, or some portion of these funds, for itself or on behalf of the individual tribal members. NCT must support its claims for unjust enrichment and imposition of a constructive trust with admissible evidence that comports with the requirements of the law. *See Hiebert*, ¶¶ 30-32.

**Unjust Enrichment Pre-2002**

¶41     The District Court determined that the three-year statute of limitations barred NCT's unjust enrichment claims related to St. Labre's fundraising that had taken place before 2002. Section 27-2-202(3), MCA, provides for a three-year limitations period for the commencement of an action upon an obligation or liability, other than a contract, account, or promise, not founded upon an instrument in writing. The period of limitations for a constructive trust or unjust enrichment claim begins when the claim accrues. Section 27-2-102(2), MCA.

¶42     The District Court reasoned that a constructive trust would have been created by law when St. Labre began "reaping enormous monies marketing the [NCT's] plight and needs." The court concluded that any constructive trust would have been created by law in 1952 when St. Labre started its direct mail campaign. Accordingly, application of the three-year statute of limitations would have run on NCT's unjust enrichment and constructive trust claims in 1955. NCT filed this action on March 11, 2005. The District Court granted

summary judgment on NCT's unjust enrichment claims that originated before March 11, 2002.

¶43 The District Court correctly determined that the statute of limitations generally begins to run as to a constructive trust "at the moment the law creates the trust." *Opp v. Boggs*, 121 Mont. 131, 139, 193 P.2d 379, 384 (1948). An exception to this general rules exists, however, where "there is a relationship of trust and confidence" and the beneficiary of the constructive trust "has no reason to believe that the constructive trustee is holding the property adversely." *Opp*, 121 Mont. at 139, 193 P.2d at 384. The statute of limitations begins to run on claims of constructive trust and unjust enrichment under the circumstances of this "relationship of trust and confidence" only when "the beneficiary has received notice of the assertion of an adverse interest." *Opp*, 121 Mont. at 139, 193 P.2d at 384.

¶44 No express trust exists here. The existence of any trust alleged by NCT must arise, therefore, in the context of a constructive trust. Constructive trusts may "occur where the parties have expressed no intent to create a trust." *Eckart*, 184 Mont. at 326, 602 P.2d at 991. A constructive trust simply serves "to work an equitable result." *Eckart*, 184 Mont. at 326, 602 P.2d at 991. NCT alleges first that St. Labre's fundraising efforts grounded on the plight and need of the NCT have resulted in the unjust enrichment of St. Labre that requires the imposition of a constructive trust. NCT further alleges that the circumstances that give rise to the imposition of a constructive trust demonstrate a relationship of trust and confidence between NCT and St. Labre.

¶45 The District Court determined that any unjust enrichment claim by NCT accrued when St. Labre began fundraising in 1952. St. Labre would not necessarily be unjustly

17

enriched simply by the fact that it raised money through its direct mail fundraising efforts that marketed the plight and needs of the Northern Cheyenne. An unjust enrichment claim in the context of a constructive trust created through the existence of a "relationship of trust and confidence" accrues only when an entity in a position of trust acts adversely to the interest of the beneficiary and "the beneficiary has received notice of the assertion of an adverse interest." *Opp*, 121 Mont. at 139, 193 P.2d at 384; s*ee* § 27-2-102(1)(a), MCA.

¶46 NCT argues that it did not receive notice of St. Labre's adverse interest until St. Labre stopped disbursements entirely to NCT when negotiations broke down with St. Labre in 2005. St. Labre argues that it informed NCT repeatedly, since as early as 1984, that it felt no obligation, legal or other, to disburse funds raised through its fundraising efforts to NCT. The existence of conflicting evidence as to when a cause of action accrued precludes summary judgment based on the statute of limitations. *Hill v. Squibb & Sons, E. R.*, 181 Mont. 199, 212, 592 P.2d 1383, 1390-1391 (1979).

¶47 The District Court concluded that NCT had been aware of St. Labre's fundraising efforts since at least 1952 when St. Labre began "reaping enormous monies marketing [NCT's] plight and needs." The District Court further determined that NCT has "known about St. Labre's fundraising programs and has known that St. Labre has not given all of the proceeds to the Tribe, nor ever intended to give all the proceeds to the Tribe." The court deemed NCT's knowledge of St. Labre's fundraising efforts and St. Labre's intention of not giving all of the proceeds of these fundraising efforts to NCT sufficient to trigger the launch of the three-year statute of limitations.

¶48 The District Court never addressed directly whether NCT actually received notice of "the assertion of an adverse interest" by St. Labre. NCT's mere knowledge of St. Labre's fundraising efforts would not necessarily trigger the statute of limitations in the context of a constructive trust. NCT's mere knowledge that St. Labre never intended to give "all of the proceeds" to NCT likewise does not necessarily trigger the statute of limitations in the context of a constructive trust.

¶49 The District Court cited to various documents that appear to evidence knowledge on the part of NCT of disputes with St. Labre regarding the purpose and ownership of the funds raised by St. Labre. For example, the court cited a 1983 memorandum of NCT's St. Labre Mission Task Force that raised "questions as to whether or not [St. Labre] is helping the Northern Cheyenne to the fullest extent that it is capable." The court also cited a 1997 letter to NCT's Tribal Council President that raised concerns with St. Labre's apparent failure to disclose "[f]inances, assets, investments, audits, etc." Another 1997 statement from the NCT Tribal President to St. Labre questioned whether NCT could continue to allow St. Labre "to solicit monetary contributions on our behalf while we have little or no input." Finally, the court quoted from a 1999 letter from NCT's Tribal President to St. Labre that threatened legal action if St. Labre rebuffed NCT's request for "a meaningful dialogue" to address the appropriate distribution of the "vast sums" that St. Labre had raised "largely through the use of the name, identity and symbols of the Tribe, as well as the persona of individual members of the Tribe."

¶50 NCT cites to portions of the record that contain various examples of efforts or statements by St. Labre that could be construed as evidencing cooperation and good faith. A

19

2000 letter from the executive director of St. Labre to NCT explains a recent $70,000 grant from St. Labre to NCT. A 2000 response from the executive director of St. Labre to NCT's St. Labre Mission Task Force set forth St. Labre's recent efforts to assist NCT, including $2.7 million from the Northern Cheyenne Business Development Endowment Fund, a joint endeavor of St. Labre and NCT. The letter also cites St. Labre's transfer of the Northern Cheyenne Pine Company to NCT for $1. The transaction apparently had a book value in excess of $8 million. The letter goes on to discuss other areas of potential cooperation before concluding with a warning that "in the spirit of honesty and good faith, there are some expectations of the Task Force that St. Labre will not agree to."

¶51 These documents raise the specter of two competing narratives: an acrimonious history marked by discord, recriminations, and threats, or a history of mutual give and take that reflects two competing, yet cooperative, visions of the role of St. Labre's fundraising efforts and the appropriate distribution of these funds. In light of the fact that District Court did not evaluate the accrual date of NCT's unjust enrichment claim under the standards that we discuss here, we deem it appropriate to remand this issue to allow the District Court to analyze in the first instance whether any genuine issues of material fact exist as to when NCT became aware of the assertion of an adverse interest in the alleged constructive trust, by St. Labre, the putative constructive trustee.

**Forensic Accounting**

¶52 NCT also argues that "Defendants" should be ordered to "open all books of accounting" regarding anything of value that the Diocese and St. Labre have acquired over this past half-century through the direct marketing enterprise or investment proceeds thereof.

The District Court cited NCT's failure to provide any Montana authority to support its claim that forensic accounting constitutes a valid cause of action. NCT argues that forensic accounting has survived as a viable cause of action in Montana since at least 1910.

¶53    NCT points to the Court's decision in *Alywin v. Morley*, 41 Mont. 191, 108 P. 778 (1910). A legitimate need for an accounting cause of action may have existed in 1910. The Court's adoption of the Montana Rules of Civil Procedure, including those rules that pertain to discovery, largely has eliminated the need for a stand-alone cause of action that seeks a forensic accounting. Dobbs, *Law of Remedies* at § 4.3(5), 610. The Montana Rules of Civil Procedure provide the appropriate tools for NCT to obtain pertinent financial information from the Diocese and St. Labre. We agree with the District Court that NCT could obtain all of the information that it needs to prove its unjust enrichment claim without a separate claim of forensic accounting.

¶54    *Whether the District Court properly granted summary judgment to St. Labre on NCT's claims of breach of contract, negligent misrepresentation, fraud, and wrongful conversion?*

¶55    The District Court granted summary judgment on NCT's express and implied contract claims due to NCT's failure, under *Hiebert*, ¶ 31, to submit admissible evidence based on personal knowledge to defeat a claim for summary judgment. NCT produced exhibits without supporting affidavits or indications of personal knowledge. NCT also submitted interrogatories that lacked signature pages. NCT further failed to paginate many of its exhibits and thereby allow for pinpoint citations. NCT has failed to persuade us that the District Court improperly granted summary judgment based on NCT's failure to support its

21

express and implied contract claims through admissible evidence based on personal knowledge. *Hiebert*, ¶¶ 30-32.

¶56 The District Court determined that NCT had attempted to support its negligent misrepresentation, fraud, and wrongful conversion claims through "unsupported, conclusory statements." For the same reason as its contract related claims, NCT has failed to persuade us that the District Court improperly granted summary judgment on NCT's claims of breach of contract, negligent misrepresentation, fraud, and wrongful conversion. *Hiebert*, ¶¶ 30-32.

¶57 *Whether the District Court properly granted judgment on the pleadings to St. Labre on NCT's cultural genocide and constitutional claims?*

¶58 The District Court rejected NCT's tort of cultural genocide due to NCT's failure to cite any authority that would establish or clarify the elements of the claim. The court also rejected NCT's constitutional claims on the basis that Article II, Sections 3, 4, and 10 protect only against state action. The court further recognized that adequate non-constitutional remedies exist to provide relief to NCT on its Section 3 claim.

¶59 We have not yet addressed a tort claim based directly upon an alleged violation of Article II, Section 10 of the Montana Constitution. We generally avoid addressing constitutional issues if a defendant's alleged harm can be remedied through a non-constitutional basis. *Sunburst Sch. Dist. No. 2 v. Texaco, Inc.*, 2007 MT 183, ¶ 62, 338 Mont. 259, 165 P.3d 1079. NCT has alleged potentially viable claims of unjust enrichment and constructive trust that could serve as the basis for relief for St. Labre's alleged failure to distribute equitable shares of funds to NCT. An unjust enrichment claim can address

22

sufficiently the principal harm alleged—whether NCT has been deprived of funds to which it is entitled. We decline to address the District Court's dismissal of NCT's constitutional claims made under these circumstances. *Sunburst*, ¶ 62.

**CONCLUSION**

¶60    We reverse and remand the District Court's decision to grant summary judgment to the Diocese and St. Labre on NCT's claim for unjust enrichment and the imposition of a constructive trust that may arise from St. Labre's fundraising activities after 2002. The court improperly determined that NCT had to establish evidence of loss by NCT or wrongdoing by the Diocese and St. Labre in order to make out a claim for unjust enrichment. We also reverse and remand the District Court's decision to grant summary judgment to the Diocese and St. Labre regarding St. Labre's fundraising activities before 2002. The District Court should evaluate in the first instance the accrual date of NCT's unjust enrichment claim pursuant to the standards set forth herein. The District Court can address on remand those - defenses raised by the Diocese and St. Labre not resolved through the summary judgment proceedings. We affirm the District Court's grant of summary judgment on all of NCT's remaining claims.

/S/ Brian Morris


We Concur:

/S/ Mike McGrath
/S/ Patricia O. Cotter
/S/ Beth Baker
/S/ Jim Rice

23